# United States Court of Federal Claims

No. 12-459C
(Filed Under Seal:  April 5, 2013)
(Reissued:  April 17, 2013)[*]
PUBLISHED

---

**STATE OF NORTH CAROLINA
BUSINESS ENTERPRISES
PROGRAM,** *et. al.*,

                             *Plaintiffs*,

**v.**

**UNITED STATES OF AMERICA,**

                             *Defendant*.

Pre-award bid protest; Motion to
supplement administrative record;
Standing; Prejudice

---

    *William R. Purdy*, Bradley Arant Boult Cummings LLP, Jackson, MS, for plaintiffs.

    *Michael D. Austin*, Commercial Litigation Branch, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

*Block, Judge.*

    Before the court are cross-motions for judgment on the administrative record in a pre-award bid protest, in which plaintiffs[1] challenge the terms of a solicitation issued by the United States Army (the "Army") to provide full food services at Fort Bragg.

---

[*] This opinion originally was issued under seal on April 5, 2013.  The court afforded the parties an opportunity to propose redactions in the opinion prior to its publication.  The opinion is herewith reissued with redactions.

[1] Plaintiff Timothy Jones is a licensed blind vendor as defined by the Randolph-Sheppard Vending Stand Act (the "Randolph-Sheppard Act"), 20 U.S.C. §§ 107a(a)(5), 107a(b), 107e(1). Amend. Compl. ¶ 3.  Plaintiff North Carolina Food Services ("NCFS") is a joint venture between Jones and KCA Corporation, a commercial food service company incorporated in Kentucky.  *Id.* ¶ 6.  NCFS is Jones' "operational entity" for forming food service contracts at Fort Bragg.  *Id.* Plaintiff State of North Carolina Business Enterprises Program, North Carolina Division of Services for the Blind, Department of Health & Human Services, is the North Carolina state licensing agency ("NC-SLA") established pursuant to the Randolph-Sheppard Act, 20 U.S.C. §§ 107a(a)(5), 107b.  Amend. Compl. ¶ 2.  Pursuant to regulations established by the United States

Fort Bragg, located in North Carolina, is a significant military facility that plays a vital role in the defense of our nation. It is home to the 82nd Airborne Division, which consists of approximately 90,000 soldiers who comprise 40 percent of the Army's ten-division active duty force. AR 53. It is also the headquarters of several major Army commands, including the "Green Berets" of the US Army Special Operations Command. *Id.* During the wars in Afghanistan and Iraq, some units based at Fort Bragg have conducted as many as four deployments to combat zones. *Id.* But with those wars winding down, the troops are coming home, and as a result the number of American military personnel at Fort Bragg is expected to increase, perhaps dramatically. *Id.*

This return poses a problem for the Army Food Program, a "comprehensive program developed to ensure soldiers are provided with safe and secure food service and drinking water supply." *Id.* The Army Food Program provides "Full Food Services," which encompass "those activities that comprise the full operation of an Army dining facility which include[], but [are] not limited to, requisitioning, receiving, storing, preparing and serving of food." *Id.* Because of the uncertainty as to the number of troops who will be at Fort Bragg, it is unclear how much food will need to be requisitioned, received, stored, prepared, and served in the next few years.

In this pre-award bid protest, plaintiffs challenge the manner in which the Army chose to deal with this uncertainty. Specifically, plaintiffs allege that the Army erred by, *inter alia*, soliciting prices per meal based on a "MAX QUANTITY" figure for each contract line item number ("CLIN") when the number of meals (the "headcount") is so unpredictable. In essence, plaintiffs argue that it is unfair for the Army to ask them to bear the risk of a fluctuating headcount.

More specifically, under the Army's chosen pricing methodology, offerors must bid a price per meal without knowing what actual headcount will be. Because of economies of scale, an offeror will ordinarily wish to base its price per meal on an estimate of headcount. Selecting a price per meal without knowing headcount is risky: if headcount is unexpectedly high, an awardee who bid a low price per meal could be ruined. Thus, the Army's pricing methodology requires offerors to assume much of the risk.

The Army might have chosen a different methodology that is less of a burden on offerors. But, given the facts of this case, is it required to do so as a matter of law? The question facing the court is whether the chosen pricing methodology that requires offerors to assume the risk of a fluctuating headcount is so onerous that it is arbitrary and irrational as a matter of law.

As elaborated below, the answer is no. While the Army must provide offerors with the "best available information" in order to enable them to bid "intelligently," *Glenn Defense Marine (Asia) PTE, Ltd. v. United States*, 97 Fed. Cl. 568, 580 (2011), it is not forbidden from soliciting prices in a way that requires offerors to assume the risk of a fluctuating headcount. As risky as performance may be under the contract here, there is no legal basis for enjoining the Army from employing a methodology that solicits a price per meal.

---

Department of Education, *see* 34 C.F.R. § 395.33, the NC-SLA is the nominal offeror who formally submits an offer on behalf of a blind vendor. Amend. Compl. ¶ 4. Plaintiffs have collectively been the incumbent contractor for full food services at Fort Bragg for sixteen years, Pl.'s Mot. Ex. 5 ¶ 14, and they have collectively submitted a single offer to the instant solicitation.

It should be noted at the outset that plaintiffs have also moved to supplement the administrative record and admit evidence to the court's record. The affidavits with which plaintiffs seek to supplement the administrative record simply detail how the Army's chosen pricing methodology negatively affects plaintiffs. But they cannot be read to show unlawful or erroneous conduct by the Army. Thus, as explained below, the court will grant plaintiffs' motion with respect to those portions of the affidavits that assist the court in understanding the prejudice to plaintiffs. But the court will deny plaintiffs' motion with respect to those portions of the affidavits that are offered to show that the Army acted improperly. Nevertheless, and significantly, the affidavits do not change the bottom line: the mere fact that the Army's methodology places the burden on plaintiffs to calculate price per meal does not demonstrate legal error.

Accordingly, and for reasons explained more fully below, the court will deny plaintiffs' cross-motion for judgment on the administrative record and grant defendant's cross-motion.

## I. Background

### A. The Solicitation

On June 5, 2012, the Army issued Solicitation W91247-12-R-0019 (the "Solicitation") for full food services at Fort Bragg. The Solicitation was set aside for Historically Underutilized Business Zone ("HUBZone") small business concerns with a priority afforded to plaintiffs pursuant to the Randolph-Sheppard Act. The Solicitation contemplated the award of a contract for an initial one-year base period and four options for a total potential contract duration of five years. AR 207.

Even before issuing the Solicitation, the Army was well aware of the problem of unpredictable headcount. In its Combined Acquisition Strategy/Plan, issued in May of 2012, the Army acknowledged that the number of meals that would be required at Fort Bragg was "extremely unpredictable." *Id.* 70. Indeed, as the Army well understood, there was "no way to accurately forecast the number of meals to be served or to provide interested contractors enough data to submit a reasonable proposal." *Id.* The Army went so far as to describe fluctuation in headcount as the "primary element of risk" in supplying meals to Fort Bragg. *Id.* at 60.

The Solicitation's pricing methodology reflects the Army's concerns. The Solicitation calls for an indefinite-delivery indefinite-quantity ("IDIQ") contract priced on a per meal basis. According to Section B, the Solicitation has a guaranteed minimum payout to the contractor of $10,000 applicable to the base period and an overall maximum quantity of 15,883,475 meals. *Id.* at 125.

Also in Section B, the Solicitation lists a number of CLINs consisting of various locations at Fort Bragg at which the awardee is to provide full food services. *Id.* at 125-205. Each CLIN requires an offeror to determine a unit price—that is, a price per meal—and multiply it by a given number of meals called the "MAX QUANTITY" to arrive at a dollar-figure denoted a "MAX AMOUNT." *Id.* The Solicitation provides that award will be made "to the offeror whose technically acceptable proposal represents the lowest reasonable price to the Government." *Id.* at 251. The Solicitation further provides that "[p]rice will be evaluated for reasonableness in accordance with FAR 15.404-1." AR 251.

The Solicitation does not provide any estimate of the expected number of meals to be served.  Rather, in addition to the amounts listed in Section B, the Solicitation provides historical data in Technical Exhibit B.  *Id.* at 257-76.  Elsewhere in the Solicitation, the Army explains that "Technical Exhibit B has been provided to demonstrate operating schedules, meal serving period/hours, seating capacity, number and type of serving lines, physical characteristics of each building, and historical headcount data.  It is to be utilized in aiding offerors with the pricing schedule in Section B."  *Id.* at 385.

## B.  Plaintiffs' Offer

The price per meal methodology poses a dilemma for offerors such as plaintiffs.  The usual way of choosing a price per meal is to divide the estimated cost of performance by the estimated number of meals to be served—that is, the estimated headcount.  Amend. Compl. ¶ 25.  Price per meal can thus be expressed as a fraction:  (estimated cost of performance) / (estimated headcount).  This is known as the price per meal fraction (the "PPM Fraction").  *Id.*  Moreover, in estimating cost of performance, a contractor normally considers a number of factors, including headcount itself.  Put simply, headcount is not only the denominator of the PPM fraction—it is also a key factor in determining the numerator.  Thus, in plaintiffs' words, "[h]eadcount drives price per meal."  *Id.* ¶ 29.

The importance of headcount, combined with its unpredictability here, made bidding on this Solicitation a risky proposition for plaintiffs.  If plaintiffs assumed a headcount roughly equal to the MAX QUANTITY figures, the effect would be a lower estimated cost of performance and a lower unit price.  Pls.' Mot. at 29.  But if actual headcount turned out to be less than the MAX QUANTITY figures, plaintiffs would be stuck with a low unit price and suffer a loss.  *Id.* at 29-30.  Conversely, if plaintiffs assumed a headcount somewhat less than the MAX QUANTITY figures, they would arrive at a higher unit price, thus insulating themselves against loss if they are awarded the contract.  *Id.* at 32.  But the higher price would also mean that they might be less competitive against other bids, and thus less likely to receive the award the in first place.  *Id.*

After efforts to persuade the Army to change the Solicitation proved unavailing, plaintiffs submitted a bid under protest.  In that bid, plaintiffs assumed headcounts in line with expectations plaintiffs had formed based on sixteen years of experience as the incumbent contractor.  *Id.* Appx. 121-22, Ex. 5 ¶¶ 16-20.  Based on those assumed headcounts, plaintiffs calculated prices per meal by applying the PPM Fraction.  *Id.*  Then, following the Solicitation's directions, they multiplied their prices per meal by the given MAX QUANTITY figures to produce MAX AMOUNT dollar figures.  *Id.*  Based on their estimates of headcount, plaintiffs believe the total cost will be $[REDACTED].  *Id.*  If, however, the MAX QUANTITY figures turn out to be the actual headcounts, the costs will be in excess of $[REDACTED].  *Id.*  As a result, if one adds together the total MAX AMOUNT figures listed in plaintiffs' proposal, one gets a figure in excess of $[REDACTED].  *Id.*  For plaintiffs, this creates a dilemma:  they believe that the $[REDACTED]-plus figure is far greater than what the contract is likely to cost.  Consequently, they contend that this makes their price appear higher than it actually is.  Pls.' Mot. at 34-35.

## C.  Protest History

Plaintiffs protested the Solicitation in this court on July 23, 2012, prior to the date for initial receipt of proposals.  Plaintiffs seek to enjoin the Army from continuing with the

Solicitation as written.  After several status conferences, the parties submitted cross-motions for judgment on the administrative record, followed by briefs in opposition.

Plaintiffs attached to their cross-motion for judgment on the administrative record several documents, including several affidavits.  In its opposition, defendant requested that the court strike two of these documents as being improper to supplement the administrative record. Plaintiffs responded by opposing that request and formally moving to supplement the administrative record.

On November 8, 2012, this court held a hearing on the cross-motions for judgment on the administrative record and on the motions pertaining to supplementation of the administrative record.  Having reviewed the parties' filings and heard their arguments, the court is now ready to rule on each motion in turn.

## II. Motion to Supplement the Administrative Record

Before proceeding to the merits, the court considers the propriety of supplementing the administrative record.  Plaintiffs move to supplement the administrative record with various affidavits, including two affidavits of Frederick E. Anderson and one of Kyong Cha Anderson, both employees of KCA Corporation—a minority shareholder in plaintiff NCFS.  Plaintiffs also move to supplement the administrative record with an affidavit of James Ed Rice, Jr., president of Service Corporation of America—a competitor of KCA Corporation.  Defendant opposes the motion with respect to one of Frederick E. Anderson's affidavits, *see* Pls.' Mot. Appx. 117-53, Ex. 5 (the "2nd Anderson Affidavit") and Mr. Rice's affidavit, *see* Pls.' Mot. Appx. 98-116, Ex. 4 (the "Rice Affidavit").

## A. The Scope of the Evidentiary Record in a Bid Protest

In a bid protest, the court applies the Administrative Procedure Act ("APA") standard of review and determines whether the challenged agency action was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A) (citing in 28 U.S.C. § 1491(b)(4)).  In applying this standard of review, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."  *Camp v. Pitts*, 411 U.S. 138, 142 (1973).  Accordingly, "[t]he task of the reviewing court is to apply the appropriate APA standard of review . . . to the agency decision based on the record the agency presents to the reviewing court."  *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) (citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971)); *see also Walls v. United States*, 582 F.3d 1358, 1367-68 (Fed. Cir. 2009).

Thus, this court does not have unlimited power to order additions to the administrative record.  *See Axiom Resource Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379-80 (Fed. Cir. 2009).  Rather, "supplementation of the record should be limited to cases in which 'the omission of extra-record evidence precludes effective judicial review.'"  *Id.* at 1380 (quoting *Murakami v. United States*, 46 Fed. Cl. 731, 735 (2000), *aff'd*, 398 F.3d 1342 (Fed. Cir. 2005)).  This limited power to order supplementation of the administrative record, "based upon necessity, rather than convenience," *Murakami*, 46 Fed. Cl. at 735, may be exercised to enable the court to understand the agency action and evaluate it under the APA standard of review, but it may not be exercised to enable unauthorized de novo review.

In applying this "effective judicial review" test, this court has consistently understood the test as enabling supplementation when necessary, not when merely convenient. For instance, in *Allied Technology Group, Inc. v. United States*, 92 Fed. Cl. 226 (2010), the court held that it would not supplement the administrative record with materials before the GAO if those materials were "'extra-record argumentative' submissions" that were "'not presented to the agency before it reached a decision on an award.'" *Id.* at 230 (quoting *Holloway & Co. v. United States*, 87 Fed. Cl. 381, 392 (2009)). Such submissions may contain information that is "relevant" to the agency's decision in the sense contemplated by the Federal Rules of Evidence, *see* FRE 401 (providing that evidence is "relevant" if (1) it "has any tendency to make a fact more or less probable that it would be without the evidence," and (2) "the fact is of consequence in determining the action"), but they are not proper for supplementing the administrative record.

On the other hand, there are a whole host of reasons why a court may find it necessary to supplement the administrative record to permit "effective judicial review." One court recently provided a succinct summary, noting that much extrinsic evidence is often proper material with which to supplement the administrative record:

> Such information might include tacit knowledge possessed by offeror and agency personnel of a highly technical and complex nature, requiring explication via affidavits or expert testimony. *See Hunt Bldg. [Co. v. United States]*, 61 Fed. Cl. [243], at 272 [(2004)]; *Gentex [Corp. v. United States]*, 58 Fed. Cl. [634], at 649 [(2003)]; *Bradley v. United States*, 26 Cl.Ct. 699, 701 (1992). Upon a proper showing, discovery might be allowed seeking information intentionally left out of the record, such as evidence of bias or bad faith. *See Beta Analytics Int'l, Inc. v. United States*, 61 Fed. Cl. 223, 226 (2004). And the record may be supplemented with relevant information, contained in the procurement files or generally known in an industry or discipline, which was inappropriately ignored by an agency. *See Mori Assocs., Inc. v. United States*, 98 Fed. Cl. 572, 575 (2011); *Diversified Maint. Sys., Inc. v. United States*, 93 Fed. Cl. 794, 801 (2010). These categories all concern information that is necessary for effective judicial review, because they reflect what was or should have been considered by the agency.

*East West, Inc. v. United States*, 100 Fed. Cl. 53, 57 (2011).

Moreover, although the court has emphasized that the "effective judicial review" test is a test of necessity rather than convenience, the court has permitted the use of extrinsic evidence to prove matters that were not before the agency but that are nonetheless properly before the court—matters such as prospective relief and prejudice. *See, e.g.*, *id.* at 57-58; *PlanetSpace, Inc. v. United States*, 90 Fed. Cl. 1, 5 (2009). These latter matters could not be reflected by evidence in the administrative record because they "necessarily would not be before an agency decision-maker effecting a procurement decision . . . but would necessarily post date and flow from such agency decision." *PlanetSpace*, 90 Fed. Cl. at 5 (internal quotation marks and citation omitted). Thus, evidence going to prejudice or prospective relief, if not found in the administrative record, may nonetheless be considered as part of the court's record. *See East West*, 100 Fed. Cl. at 57.

With these standards in mind, the court will consider whether to supplement the administrative record with each of the contested documents: the Rice Affidavit and the 2nd Anderson Affidavit.

**B.  The Rice Affidavit**

In his affidavit, Mr. Rice states that he believes the Solicitation's pricing methodology imposes excessive risk on bidders in view of the unpredictable nature of headcount.  Rice Affidavit ¶¶ 8-24.  He declares that he, "as a potential offeror . . . would not take the chance to submit a proposal" in response to the Solicitation as it now stands.  *Id.* ¶ 8.  He explains that the MAX QUANTITY figures are "not an adequate basis on which to accurately estimate a single price per meal that will be good for all meals served over the course of a year."  *Id.*  This is so, according to Mr. Rice, because price per meal is "sensitive to day-to-day fluctuations in headcount," *id.* ¶ 9—due to economies of scale, lower headcounts means higher cost, and vice versa, *id.* ¶¶ 10, 14-19.  Mr. Rice also explains the various difficulties food service providers at military bases face in controlling costs.  *Id.* ¶¶ 11-13.

According to Mr. Rice, the Solicitation is unfair because it "requires offerors to offer the price [per meal] on an annual maximum quantity of meals served for each [dining facility]."  *Id.* ¶ 20.  He explains that "[b]ecause the price per meal is lowest when headcount is highest, the effect of soliciting a price per meal on [a] maximum quantity is to create an artificially low price per meal."  *Id.*  An offeror who submits such a low price runs the risk of "substantial financial losses" if the actual headcount is less than the MAX QUANTITY.  *Id.* ¶ 22. The only way an offeror can "protect himself," according to Mr. Rice, is to estimate headcount and arrive at a unit price based on that estimate.  *Id.* ¶ 21. But an offeror who does that runs the risk of submitting a price per meal too high to be competitive.  *Id.* ¶ 22.  Mr. Rice "cannot see how this makes sense to anyone familiar with pricing of military food service contracts."  *Id.* ¶ 24.

Mr. Rice thereafter describes a "ready solution" to the problem—namely, the use of "headcount ranges."  *Id.* ¶ 25.  With "headcount ranges," offerors are invited to submit different prices per meal for a variety of possible headcounts.  *Id.* ¶ 27.  Rice explains that this methodology would alleviate the risk placed on offerors by "enabl[ing] offerors to submit accurate pricing for actual, variable requirements that may be imposed during performance."  *Id.* ¶ 25.  He also explains in detail how the headcount range methodology has worked in other instances.  *Id.* ¶¶ 27-32.  He further describes the headcount range methodology as "the standard practice in Army food service contracts . . . whenever cost reimbursement contracts are not used," although he also professes to be aware of only five recent instances of the headcount range methodology.  *Id.* ¶ 33.  Conversely, Mr. Rice says he is unaware of any other instance of the Army soliciting a price per meal regardless of headcount.  *Id.*  Attached to the affidavit are excerpts from solicitations in other procurements showing the headcount range methodology in practice.

Plaintiffs argue that the Rice Affidavit should be admitted to supplement the administrative record.  Specifically, plaintiffs argue that the information concerning headcount methodology constitutes "generally known" information that the Army "inappropriately ignored" in settling on its price per meal methodology.  Pls.' Mot. to Supp. at 5 (citing *East West, Inc. v. United States*, 100 Fed. Cl. 53, 57 (2011)).  Plaintiffs argue that ignoring this information was "inappropriate" because in doing so the Army "failed to consider an important aspect of the problem" relating to pricing methodology—namely, the burden the Army's chosen methodology places on offerors.  *Id.* at 6 (citing *Ala. Aircraft Indus. – Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009)).

What plaintiffs fail to demonstrate, however, is that the Army did indeed fail to consider an "important aspect of the problem." An "important aspect of the problem" is not simply whatever plaintiffs would like the Army to consider.  As Judge Kozinski, writing for the Ninth Circuit Court of Appeals, has explained:

> Whether an agency has overlooked "an important aspect of the problem" . . . turns on what a relevant substantive statute makes "important."  In law, unlike religion or philosophy, there is nothing which is necessarily important or relevant.

*Oregon Nat. Res. Council v. Thomas*, 92 F.3d 792, 798 (9th Cir. 1996).  Put another way, what constitutes an "important aspect of the problem" depends on what the substantive law deems "important."  Here, plaintiffs have failed to identify substantive law that makes the risks they face in determining a price per meal an "important aspect of the problem."

Certainly, the APA standard itself does not serve as that substantive law.  To the contrary, that standard does not permit de novo review, but instead requires significant deference to the Army's decision and permits review only for rationality.  *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 n.5 (Fed. Cir. 2001).  The court is not free to invent "important" things out of thin air and require the agency to consider them.  It may only ensure that the agency's decision is supported by reasoned judgment and that the agency considered the factors it was required by law to consider.  *See Centech Group, Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) ("[A] reviewing court may set aside a procurement action if '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'") (quoting *Impresa*, 238 F.3d at 1332)).  Whether the Army might have chosen a pricing methodology that (from plaintiffs' perspective) was better is simply not the issue, and Mr. Rice's views on which methodology was better are therefore likewise beside the point.

Nor do plaintiffs allege the sort of "bad faith" that might justify admitting extrinsic evidence.  To be sure, plaintiffs do argue that defendant's disregard of the Rice Affidavit was "intentional."  Pls.' Mot. to Suppl. at 6.  But plaintiffs mean only that the Army failed to change its pricing methodology in response to the instant bid protest.  *Id.*  Of course, the issue is whether the contracting officer, in choosing the price per meal methodology, acted in bad faith, not whether the government should have settled after plaintiffs filed a bid protest.  Plaintiffs do not allege that the contracting officer intentionally ignored their concerns about the pricing methodology, and thus it is not proper to supplement the administrative record on that basis.  *See Terry v. United States*, 96 Fed. Cl. 156, 164 (2010) (declining to supplement the administrative record with evidence of bad faith because "[m]eaningful judicial review is not advanced by supplementing the record with evidence that may support allegations that have not been pled").  Nor would the Rice Affidavit meet the test for showing bad faith, since it does not "indicate some personal animus or bias on the part of agency officials, reveal a latent inconsistency in the existing record, or otherwise give some indication that the agency's explanation is pretextual."  *Madison Servs., Inc. v. United States*, 92 Fed. Cl. 120, 130 (2010).  Rather, it simply shows that plaintiffs were unhappy with the Army's pricing methodology.

The court does not doubt that there were other ways the Army might have chosen to solicit prices—including other ways that would have minimized the risk offerors were required to bear—but (as will be explained more fully below) this is not relevant.  No law requires the Army to analyze each individual possible pricing methodology and select the one that is least

risky for offerors.  In any event, the availability of the headcount range methodology is already explained in the 1st Anderson Affidavit, the admission of which defendant specifically does not object to, and which the court will therefore consider as validly before it.

Accordingly, plaintiffs' motion to supplement the administrative record with the Rice Affidavit is denied in its entirety.

## C. The 2nd Anderson Affidavit

Like Mr. Rice, Mr. Anderson in his second affidavit explains the headcount range methodology and avers that it would impose less risk on bidders.  His affidavit is also accompanied by excerpts from other solicitations in which the headcount range methodology was employed.  Insofar as plaintiffs argue that the 2nd Anderson Affidavit should be admitted to show that the Army ignored "generally known" information about the headcount range methodology or that the Army failed to consider an "important aspect of the problem," the court finds that argument meritless for the same reason that the Rice Affidavit is inadmissible for those purposes—the existence of the headcount range methodology does not mean the Army's pricing methodology is arbitrary and capricious.  But plaintiffs additionally argue that portions of the 2nd Anderson Affidavit should be admitted as evidence going to prospective relief and prejudice. The court agrees.

After describing the headcount range methodology, Mr. Anderson then explains his personal involvement in preparing plaintiffs' bid proposal and further explains how the terms of the Solicitations influenced the bid.  2nd Anderson Affidavit ¶¶ 14-15.  Specifically, Mr. Anderson explains that plaintiffs wanted to submit an offer of $[REDACTED].  *Id.* ¶ 16.  They have based this figure, according to Mr. Anderson, on Mr. Anderson's 16 years of experience at Fort Bragg.  *Id.*  Accordingly, plaintiffs submitted unit prices which, if plaintiffs' estimates are correct, would total $[REDACTED] over the five-year contract period.  *Id.* ¶¶ 16, 17, 19, 20. However, because the Solicitation requires plaintiffs to multiply their unit prices by MAX QUANTITY figures, the MAX AMOUNT figures plaintiffs wrote down in their proposal total over $[REDACTED].  *Id.* ¶¶ 17, 19, 20, 21, 22.

In essence, Mr. Anderson explains how, in his view, the terms of the Solicitation require plaintiffs to submit an offer that appears higher than it would but for the Army's alleged errors. This evidence does not concern any decision before the Army, but rather concerns the effect of those decisions on plaintiffs.  Specifically, the evidence goes to how the alleged errors caused plaintiffs to submit a bid that allegedly appears higher than it really is, thus resulting in a competitive injury.  Such evidence of prejudice "necessarily would not be before an agency decision-maker effecting a procurement decision . . . but would necessarily post date and flow from such agency decision."  *PlanetSpace*, 90 Fed. Cl. at 5 ((internal quotation marks and citation omitted).

This court has held that such evidence may be part of the court's record.  For example, in *East West*, this court considered extrinsic evidence of prejudice to show how an agency's action impacted the plaintiff's bid.  In that case, the plaintiff was protesting its having been excluded from the competitive range in a National Institutes of Health (NIH) procurement for custodial services.  *East West*, 100 Fed. Cl. at 54.  The plaintiff sought to admit a declaration of one of its executives indicating that the plaintiff had proposed a certain level of staffing in reliance on guidance given by NIH officials.  *Id.* at 54-55.  Although the court did not permit supplementation of the administrative record with the declaration to show error, *id.* at 56-57, it

did rule that the declaration could be considered as evidence of prejudice, *id.* at 57-58. The court recognized that "a bid protester's entitlement to relief may often turn on considerations of injury that spring from the challenged actions, and to that extent could not be reflected in the agency record underlying those actions." *Id.* at 57. The declaration, by describing how NIH's actions influenced the plaintiff's bid, arguably showed that NIH's own actions induced the plaintiff to make "competitively-fatal changes" to its proposal. *Id.* at 57-58.

Here, as in *East West*, it is proper to admit an affidavit to show prejudice—even though it is not proper to show error. The 2nd Anderson Affidavit describes how plaintiffs altered their bid in response to the Army's pricing methodology, just as the declaration in *East West* showed how the plaintiff there changed its proposal in response to communications with the agency. As in *East West*, such evidence is not reflected in the agency record, but nonetheless is crucial evidence in determining whether plaintiffs were prejudiced by the challenged procurement decision.

Accordingly, the court will grant plaintiffs' motion to admit evidence into the record with respect to paragraphs 14 through 25 of the 2nd Anderson Affidavit. These paragraphs describe how plaintiffs drafted their proposal in response to the pricing methodology. They therefore go to the issue of prejudice. With respect to paragraphs 1 through 13 of the 2nd Anderson Affidavit and portions of plaintiffs' briefs relying thereon, the court will deny plaintiffs' motion to supplement the administrative record. These paragraphs, like the Rice Affidavit, simply explain why plaintiffs find the pricing methodology the Army selected to be less advantageous than another possible methodology. Plaintiffs do not explain why the Army was required to consider what methodology was more advantageous from plaintiffs' perspective.

## D.  Other Documents

Also attached to plaintiffs' motion for judgment on the administrative record were (1) updated portions of the Solicitation, (2) the 1st Anderson Affidavit, and (3) the Affidavit of Kyong Cha Anderson. Defendant has stipulated to supplement the administrative record with the updated portions of the Solicitation. Defendant has also agreed that the two affidavits should be part of the court's record provided that plaintiffs move for their inclusion. Plaintiffs have so moved.

In light of the parties' agreement, the court grants plaintiffs' motion to supplement the administrative record with the updated portions of the Solicitation. It further grants plaintiffs' motion to admit the 1st Anderson Affidavit and the Affidavit of Kyong Cha Anderson as parts of the court's record.

### III.  Cross-Motions for Judgment on the Administrative Record

The court now turns to the parties' cross-motions for judgment on the administrative record.

## A.  Standing

As an initial matter, defendant challenges plaintiffs' standing to bring this pre-award bid protest. Defendant argues that because the contracting officer has not yet determined whether plaintiffs' bid is within the competitive range, plaintiffs have not been harmed. Defendant additionally argues that injunctive relief would not redress any injury plaintiffs have suffered

because such relief would not ensure that plaintiffs are ultimately found to be within the competitive range.

Pursuant to the Tucker Act, an "interested party" may challenge an agency action in connection with a procurement. 28 U.S.C. § 1492(b)(1). An "interested party" is one that (1) is an "actual" or "prospective bidder," and (2) possesses a direct economic interest. *Rex Servs. Corp. v. United States*, 448 F.3d 1305, 1307–08 (Fed. Cir. 2006). In a pre-award bid protest, the requisite economic interest consists of "a non-trivial competitive injury which can be redressed by judicial relief." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1361 (Fed. Cir. 2009) (citing *WinStar Commc'ns, Inc. v. United States*, 41 Fed. Cl. 748, 763 (1998)).

The parties agree that plaintiffs meet the "actual" or "prospective" bidder requirement. See Tr. at 4 (government counsel acknowledging that plaintiffs collectively "are an actual or prospective bidder"). Rather, the disagreement concerns the second prong of the test: whether plaintiffs have alleged "a non-trivial competitive injury which can be redressed by judicial relief." *See Weeks Marine*, 575 F.3d at 1361. Plaintiffs assert that they have suffered the requisite injury because the terms of the Solicitation (which plaintiffs argue require them to bid based upon unrealistically high MAX QUANTITY figures) prevent plaintiffs from bidding intelligently. Defendant argues that even if this constitutes a non-trivial competitive injury, it is not one that can be redressed by judicial relief.

Inability to compete intelligently is undoubtedly a non-trivial competitive injury. As this court has explained, the *Weeks Marine* standard for injury is satisfied when plaintiff alleged a "reduced right to compete." *Distributed Solutions, Inc. v. United States*, 104 Fed. Cl. 368, 380– 81 (2012). The court has also recognized that, as a general rule, a bidder has a right to a solicitation that permits the bidder "to compete intelligently and on a relatively equal basis." *Glenn Defense Marine (Asia), PTE Ltd. v. United States*, 97 Fed. Cl. 568, 578 (2011) (quoting *Interface Flooring Sys., Inc.*, B-225439, 1987 WL 101567, at *5 (Comp. Gen. Mar. 4, 1987)) (internal quotation marks omitted). When a bidder is denied its right to compete intelligently, its right to compete is thereby reduced, thus amounting to a non-trivial competitive injury.

Moreover, defendant is simply incorrect that plaintiffs' alleged injury is not one that can be redressed by injunctive relief. If the court grants the injunctive relief plaintiff requests, the Army will be forced to change the terms of the Solicitation so as to cure whatever errors the court finds. This will enable plaintiff to compete on an intelligent basis, thus redressing the alleged injury. It is true that such relief will not guarantee that plaintiffs are found to be within the competitive range, but that is simply to say that injunctive relief will not redress an injury that plaintiffs have not yet suffered. As for the injury plaintiffs *have* allegedly suffered—injury to their ability to compete intelligently—there is no dispute that injunctive relief would provide the redress plaintiffs seek.

Finally, defendant's argument that plaintiffs should have waited until they were excluded from the competitive range is deeply flawed. Because plaintiffs are challenging an alleged defect in the Solicitation, they had to bring their protest either now or never. *See Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007) ("[A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims."). The Federal Circuit has rejected as "anomalous" a view of standing that "set[s] up a judicial scheme whereby a party

runs afoul of the [*Blue & Gold*] waiver rule if it waits to challenge a solicitation . . . but is properly dismissed on standing grounds if it raises the challenge pre-award." *Weeks Marine*, 575 F.3d at 1363.   Forcing plaintiffs here to wait for the contracting officer to determine the competitive range would inflict a similar Hobson's choice on plaintiffs, who (under *Blue & Gold*) would be unable to bring their challenge to the Solicitation at a later time.[2]

For the foregoing reasons, the court concludes that plaintiffs have met the requirements of pre-award bid protest standing and that the court has jurisdiction to consider the merits.

## B.  Standards

Before proceeding to the merits, it is necessary first to review the standards governing adjudication of bid protests.  Pursuant to 28 U.S.C. § 1491(b), the court must review challenged procurement actions under the standard set forth in the APA at 5 U.S.C. § 706.  *See Impresa*, 238 F.3d at 1332.  That standard permits the court to set aside a procurement action if that action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).   Under this standard, the court must be deferential, for it is "not empowered to substitute its judgment for that of the agency."  *Citizens to Preserve Overton Park*, 401 U.S. at 416; *see also Weeks Marine*, 575 F.3d at 1368-69 (citing *CHE Consulting, Inc. v. United States*, 552 F.3d 1351, 1354 (Fed. Cir. 2008)).

But even if a plaintiff meets its heavy burden under the APA standard, it must still show that, as a factual matter, it was harmed by the procuring agency's improper conduct.  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005).   In adjudicating cross-motions for judgment on the administrative record under RCFC 52.1, the court's task is to make that determination by conducting an expedited trial on the administrative record, properly supplemented to permit meaningful judicial review.  *Axiom*, 564 F.3d at 1381; *Bannum*, 404 F.3d at 1356; *see also PlanetSpace, Inc. v. United States*, 92 Fed. Cl. 520, 532 (2010) ("Where, as here, the parties have filed cross-motions for judgment on the administrative record pursuant to RCFC 52.1, the court conducts an expedited proceeding and only considers that evidence contained within the agency record . . . as properly supplemented by those materials necessary to permit meaningful judicial review consistent with the APA.") (internal citations and quotation marks omitted).  The court will grant a motion for judgment on the administrative record "only if 'a party has met its burden of proof based on the evidence in the record.'"  *Towne v. United States*, 106 Fed. Cl. 704, 709 (2012) (quoting *Peterson v. United States*, 104 Fed. Cl. 196, 204 (2012)).

With these standards in mind, the court turns to the individual claims plaintiffs raise in their amended complaint.  That amended complaint lists six separate counts alleging various errors concerning principally (1) the Army's decision to solicit prices per meal, (2) the Army's inclusion and use of a MAX QUANTITY figure for each CLIN, and (3) the Army's inclusion

---

[2] In a footnote, defendant suggests that plaintiffs' protest "might be construed as unripe" because plaintiffs' injury supposedly depends on future events that may or may not happen (*i.e.*, the contracting officer determining that plaintiffs' bid is outside the competitive range). Def.'s Mot. at 16 n.5 (citing *Ceres Gulf, Inc. v. United States*, 94 Fed. Cl. 303, 317 (2010)).   Again, this misstates the nature of plaintiffs' alleged injury.  Plaintiffs allege that they have been prevented from bidding intelligently.  The contracting officer's eventual determination of the competitive range is irrelevant to that alleged injury.

and use of historical data in Technical Exhibit B. Rather than address each count sequentially, the court will address them in order of what aspect of the Solicitation they challenge. First, the court will consider those counts that challenge the price per meal methodology. Second, the court will consider those counts that challenge the MAX QUANTITY figures. Third, the court will consider the remaining count that challenges Technical Exhibit B.

## C. The Price Per Meal Methodology

1. Count One

In Count One, plaintiffs argue that because price per meal is dependent on headcount, it is irrational for the Army to require offerors to submit a price per meal. Amend. Compl. ¶¶ 16-75; Pls.' Mot. at 12-26. Plaintiffs appear to contend that because headcount is so unpredictable, and because a price per meal is so dependent upon headcount, the Army's pricing methodology does not enable offerors to bid intelligently. Pls.' Mot. at 19 ("Without being able to predict the headcount per day to within a reasonable degree of certainty, it is not possible to quote an accurate price per meal."); *id.* at 20 ("The Army does not know what its headcounts will be next week, much less 5 years from now. How is an offeror supposed to price intelligently such an unknown?"); *id.* at 21 ("Without knowing headcount per day to within a reasonable degree of certainty, it is not possible accurately to estimate a price per meal."); *id.* at 22 ("Without knowing actual future headcount within a reasonable range of certainty, there is no way a contractor can reliably forecast its earnings."); *id.* at 26 ("[T]here is no coherent and reasonable explanation for the Army's stubborn determination to use a pricing methodology dominated by unpredictable headcount with respect to which there is 'no way' for offerors to be able to submit a reasonable proposal."). This argument is without merit.

This court has noted that "'[a]s a general rule, offerors must be given sufficient detail in an RFP to allow them to compete intelligently and on a relatively equal basis.'" *Glenn Defense Marine*, 97 Fed. Cl. at 578 (quoting *Interface Flooring Sys., Inc.*, B-225439, 1987 WL 101567, at *5) (Comp. Gen. Mar. 4, 1987)). But "[i]n a solicitation for an IDIQ contract, where an agency's needs are indeterminate at the time of contracting, a comparative price evaluation of competing proposals presents a particular challenge." *Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl. 672, 713 (2010). The indeterminacy of the agency's needs also makes difficult the offeror's task of bidding intelligently. Ordinarily, the problem is solved by having the solicitation contain an estimate of the agency's admittedly uncertain needs. *See Glenn Defense Marine*, 97 Fed. Cl. at 578 (citing *West Coast Copy, Inc.*, B-254944 *et al.*, 1993 WL 476970, at *5 (Comp. Gen. Nov. 16, 1993)). But "[w]hen the agency lacks sufficient information to provide the offerors with realistic estimated quantities, it is not unreasonable for the agency to base the solicitation upon the best available information . . . and rely on the professional expertise and business judgment of the bidders to fill in the missing information for themselves." *Id.* at 580 (internal quotation marks and citations omitted).

In this case, all are agreed that the Army cannot reasonably estimate its needs at Fort Bragg. This does not mean, as plaintiffs would have it, that the Army must forego asking for a price per meal and instead allocate to itself the risk of fluctuating headcount. Rather, the Army need only provide the "best available information" to enable offerors to estimate headcount for themselves. *See id.* Beyond that, the Army is free to "rely on the professional expertise and business judgment of the bidders" to arrive at their own estimates of headcount. *See id.* In short,

nothing requires the Army to bear the risk of fluctuating headcount, so long as the Army enables offerors to compete "intelligently" by providing them with the "best available information."

Plaintiffs have not argued, much less established, that the Army has withheld information. The closest plaintiffs come to making such an argument is to suggest, in argument relating to Count Two (discussed below), that the historical data provided in Technical Exhibit B is insufficient to enable offerors reasonably to estimate headcount. Pls.' Mot. at 38-42. But plaintiffs admit that they based their own estimates on 16 years of experience. 2nd Anderson Affidavit ¶ 16. Accordingly, even if the Army could have provided more historical information to enable offerors better to estimate headcount at Fort Bragg, plaintiffs are not prejudiced by this failure.[3]

Plaintiffs argue that the unpredictability of headcount affects the contractor's compensation and could cause the contractor's "financial ruin" in the event that the contractor's estimated headcount does not materialize. *See* Pls.' Mot. at 21-22. But plaintiffs cannot explain the relevance of this fact. There is nothing unusual about a private business having to assume risk—even risk of "financial ruin"—if business is slow. If plaintiffs do not wish to bear that risk, they do not have to compete for the contract. But they have pointed to no substantive law that requires the Army to change the Solicitation so that plaintiffs can compete without taking the risk that other businesses take all the time.

Plaintiffs also argue that the Army "failed to consider an important aspect of the problem" by failing to consider using a different pricing methodology. Pls.' Mot. at 23 (quoting *Ala. Aircraft Indus.*, 586 F.3d at 1375). Specifically, plaintiffs argue that they urged the Army to consider employing "headcount ranges," whereby offerors would be asked to submit prices per meal for various ranges of possible headcounts. Plaintiffs argue that this methodology would obviate the need for offerors to bear the risk of headcount fluctuations.

As explained above, whether other pricing methodologies might have been better from plaintiffs' perspective is not "an important aspect of the problem" because no statute or regulation renders it important. *See Oregon Nat. Res. Council*, 92 F.3d at 798 ("In law, unlike religion or philosophy, there is nothing which is necessarily important or relevant."). The issue is not whether the Army *could have* selected a pricing methodology that (from plaintiffs' perspective) was *better*—the issue is whether the pricing methodology the Army *did* select is arbitrary, capricious, or otherwise contrary to law. Plaintiffs may prefer that the Army permit them to quote many different prices to cover many different possible headcounts, but no statute or regulation demands that result.

---

[3] Nor is the court persuaded by plaintiffs' argument that the MAX QUANTITY figures were insufficient information on which to base prices per meal. *See* Pls.' Mot. at 20-21. As the court will explain below in the section dealing with plaintiffs' challenge to the MAX QUANTITY figures, those figures were not estimates of headcount, and nothing in the Solicitation requires offerors to base their prices per meal on these figures rather than on historical data or any other consideration. Thus, plaintiffs' argument that "[t]he Army compounds the irrationality of its pricing methodology by *requiring* offerors to calculate a price per meal based upon a single maximum quantity of headcount," Pls.' Mot. at 20 (emphasis added), is simply an attack on a straw man.

2.  Count Five

Plaintiffs argue that even if the price per meal methodology is generally permissible, it is not permissible in the case of so-called "field feeding pricing," which concerns the provision of meals at various locations at Fort Bragg outside the dining facilities.  Pl.'s Mot. at 22.  In Count Five of their amended complaint, plaintiffs point out that CLIN 0100, *see* AR 140, "imposes a full food service filed requirement with an annual MAX QUANTITY of 437,209 meals." Amend. Compl. ¶ 128.  Plaintiffs argue that because the Solicitations does not provide information about "average headcounts, average number of field locations, or average durations of each type (i.e. breakfast, lunch, dinner) of field feeding," *id.* ¶ 132, they cannot reasonably estimate price per meal for field feeding.

But, again, plaintiffs do not allege that the Army is withholding any information that is *available*.  Indeed, plaintiffs concede that such information might be unavailable.  *Id.* ¶ 135 ("If the Army cannot provide such data, then the Army should solicit its field feeding requirement on a cost-reimbursable basis or on a unit price per field feeding occurrence preferably with headcount ranges.").  But the remedy for the Army being unable to provide more information is not to require the Army to choose a new pricing methodology—it is for plaintiffs to either agree to assume the risks or to refrain from competing for the contract.

3.  Count Six

In Count Six of their amended complaint, plaintiffs argue that the Army selected the price per meal methodology because it was operating under the "false premise" that contractors can control costs by closing dining facilities.  Amend. Compl. ¶¶ 138-49; Pls.' Mot. at 45-47. Plaintiffs argue, *see* Amend. Compl. ¶¶ 138-44; Pls.' Mot. at 45-46, that although only installation commanders can close dining facilities, the Combined Acquisition Strategy/Plan wrongly assumes that contractors can close facilities on their own initiative when it says, "The wide fluctuation [in headcount] requires the contractor to be efficient in opening and closing dining facilities on short notices as dictated by mission requirements."  AR 60.

Although government counsel apparently has nothing to say about this issue, the court does not read the Combined Acquisition Strategy/Plan the same way plaintiffs do.  It seems to the court that the more plausible reading of the statement in question is that when the installation commander gives "short notice" that a dining facility must be closed or opened, the contractor should be efficient carrying out whatever work is needed to close or open that facility.  Thus, the court does not agree that the price per meal methodology was based upon a "false premise" that a contractor can open and close dining facilities on its own initiative.

**D.  The MAX QUANTITY Figures**

1.  Count Three

In Count Three, plaintiffs allege that the Army's use of a "MAX QUANTITY" for each CLIN is improper.  Amend. Compl. ¶¶ 94-112; Pls.' Mot. at 27-38.  In particular, plaintiffs contend that the MAX QUANTITY figures have no rational basis and that offerors are forced to distort their unit prices by basing those prices on these supposedly irrational MAX QUANTITY figures.  *Id.*  In plaintiffs' telling, the Solicitation requires offerors to assume a headcount equal to each MAX QUANTITY, to use that headcount in calculating cost of performance, and to plug that headcount into the PPM Fraction to arrive at a price per meal.  *Id.*  In other words, plaintiffs

regard each MAX QUANTITY as an estimate of actual headcount which plaintiffs must use in calculating their unit prices.  *Id.*

Plaintiffs' objection is based on an erroneous reading of the Solicitation.  The Solicitation does not require offerors to plug each MAX QUANTITY into the PPM Fraction in order to calculate a price per meal.  The Solicitation permits each offeror use its own estimate of actual headcount in calculating a price per meal.  Indeed, as plaintiffs admit, that is precisely what they did.  *See* 2nd Anderson Affidavit ¶ 16.

It is true that the Solicitation requires offerors to multiply the price per meal (however calculated) by the given MAX QUANTITY to arrive at a MAX AMOUNT dollar-figure.  But the Solicitation does not indicate that the MAX QUANTITY is to be regarded (either by the offeror or by the Army) as an estimate of *actual* headcount.  Indeed, the very word "MAX" suggests that both the MAX QUANTITY and the MAX AMOUNT are upper limits—worst-case scenarios—rather than estimates.

Thus, even assuming that each MAX QUANTITY is "inaccurate" as an "estimate" of headcount, plaintiffs are not prejudiced.  It is not the intended function of a MAX QUANTITY to serve as an estimate of actual headcount, and this is clear to any reasonable offeror.  Plaintiffs' own conduct demonstrates that they grasp this, for in submitting their offer they did *not* treat each MAX QUANTITY as an estimate of headcount.  In calculating their own unit price for each CLIN, plaintiffs apparently ignored the MAX QUANTITY for the very sound reason that they did not want to be stuck with a relatively low price per meal if the actual headcount turned out to be far below the MAX QUANTITY.  2nd Anderson Affidavit ¶ 18 (noting that plaintiffs based their prices per meal on their own estimates of headcount).  There is no ground for fearing that other bidders will throw caution to the wind and lower their own prices on the assumption that a figure described as a "*MAX* QUANTITY" is an estimate of probable headcount.

Accordingly, the court finds no prejudicial error in the Solicitation's "MAX QUANTITY" figures.

2.  Count Four

Plaintiffs allege that the Solicitation's minimum purchase guarantee of $10,000 applicable to the initial one-year Base Ordering Period and the MAX QUANTITY figures violate FAR 19.202-1(c), *see* Amend. Compl. ¶¶ 113-26; Pls.' Mot. at 42-45, which provides that a contracting officer shall "[e]nsure that delivery schedules are established on a realistic basis that will encourage small business participation to the extent consistent with the actual requirements of the Government."  FAR 19.202-1(c).  Plaintiffs contend that neither the $10,000 minimum purchase guarantee nor the MAX QUANTITY figures are "realistic" because neither reflect what the Army's actual needs are likely to be.

Assuming arguendo that the minimum purchase guarantee and the MAX QUANTITY figures are comprehended by the term "delivery schedule"—a point that the parties do not address but that is far from clear to the court[4]—plaintiffs' arguments as to FAR 19.202-1(c) proceed as though the minimum purchase guarantee and the MAX QUANTITY figures were intended to be estimates.  But of course they are not estimates.  The minimum purchase

---

[4] The term "delivery schedule" normally refers to the "timing" of delivery, rather than the amount. *See, e.g.*, FAR 11.401-403.

guarantee represents a "minimum" amount that the Army "guarantees" will be paid, and the MAX QUANTITY figures (as already explained) represent the "maximum" number of meals authorized to be purchased for each CLIN. Given what these figures represent, it makes no sense to require them to be "realistic" in the sense of accurately estimating the Army's probable needs.

Rather, the FAR elsewhere specifically addresses the requirements for the minimum purchase guarantee in an IDIQ contract. *See* FAR 16.504(a). That provision states that the minimum purchase guarantee may be a number of units or a dollar figure, *id.*, and that it must be "more than a nominal quantity, but . . . should not exceed the amount that the Government is fairly certain to order," FAR 16.504(a)(1). Plaintiffs do not attempt to argue that the minimum purchase guarantee here is "nominal," and the court rejects their efforts to supplant the requirement that the minimum guarantee be "more than a nominal quantity" with a requirement that it be a "realistic" estimate of the Army's actual needs.

### E. Technical Exhibit B

Finally, in Count Two, plaintiffs contend that the Solicitation falsely and misleadingly portrays headcount as stable when it is acknowledged to be fluctuating. Amend. Compl. ¶¶ 76-93; Pls.' Mot. at 38-42. Specifically, plaintiffs point to Technical Exhibit B, which "contains seemingly precise information about each of the ten dining facilities at Fort Bragg for which prices are being solicited." Pls.' Mot. at 39. Plaintiffs point to the Army's statement in the Solicitation that the historical data "is to be utilized in aiding offerors with the pricing schedule," AR 386, arguing that without a warning that headcount fluctuates, this statement will induce "unwary offerors . . . to rely to their detriment on unreliable and non-binding historical headcount data." Pls.' Mot. at 41.

Of course, the Army's call for offerors to "utilize" the historical data in Technical Exhibit B is a far cry from directing offerors to uncritically accept the historical data as indicative of future headcount. The historical data, like the MAX QUANTITY figures, are not estimates and do not purport to be. It is quite true, as plaintiffs say, that "[e]stimates put in a solicitation which bidders may not reasonably rely upon 'would be surplusage at best or deception at worst.'" Pls.' Mot. at 42 (quoting *Womack v. United States*, 389 F.2d 793, 801 (Ct. Cl. 1968)). But that principle applies to *estimates*, not historical data.

But even more to the point, plaintiffs are not "unwary." Indeed, they know full well that headcount fluctuates, and they are not misled by the historical data into believing that headcount will be stable. Their fear that other offerors will be misled by the data is entirely speculative, and it is not clear how plaintiffs would be prejudiced even if other offerors are misled.

### F. Summary

This exhausts plaintiffs' allegations of error. In short, while plaintiffs go to great lengths to show the dire risks of competing in the instant procurement, they show no prejudicial legal errors. Under the deferential standard governing this court's review of procurement actions, the court must sustain the instant Solicitation.

### IV.  Conclusion

Plaintiffs' **MOTION** to admit evidence to the record is **GRANTED** with respect to paragraphs 14 through 25 of the 2nd Anderson Affidavit (Tab 5 of plaintiff's cross-motion for judgment on the administrative record) and updated portions of the Solicitation (Tab 1 of the

same cross-motion ).  Plaintiffs' **MOTION** to supplement the administrative record is **DENIED** with respect to the remainder of the 2nd Anderson Affidavit and the entirety of the Rice Affidavit (Tab 4).  Plaintiffs' **MOTION** to admit the 1st Anderson Affidavit (Tab 2) and the Affidavit of Kyong Cha Anderson (Tab 3) as parts of the court's record is **GRANTED**.

Plaintiffs' **CROSS-MOTION** for judgment on the administrative record is **DENIED**. Defendant's **CROSS-MOTION** for judgment on the administrative record is **GRANTED**.

Accordingly, the Clerk is hereby directed to take the necessary steps to dismiss this matter.

**IT IS SO ORDERED.**

*s/ Lawrence J. Block*

Lawrence J. Block